# CASES

### ARGUED AND DETERMINED

#### IN THE

# SUPREME COURT OF ILLINOIS.

THE BALTIMORE AND OHIO AND CHICAGO RAILROAD COMPANY

*v.*

THE ILLINOIS CENTRAL RAILROAD COMPANY.

*Filed at Ottawa March 30, 1891.*

1. CONTRACT—*under seal—change of terms by parol.* It is not competent to modify or change the terms of a lease or other agreement under seal, by proof of a subsequent parol understanding or agreement. This will exclude any theory that the parties thereto, by their subsequent conduct, gave any authoritative interpretation of such agreement or lease.

2. LEASE—*option in lessee to extend the term—limited to the premises designated.* A railway company leased ground to another for its use for a term of five years, and agreed, in writing, to furnish to the lessee company permanent station grounds and other terminal facilities, if, within such term, the latter should elect to take certain designated grounds in perpetuity. Within the time limited, the lessee notified the lessor that it had elected to take a perpetual lease of ground not mentioned in the lease and agreement: *Held,* that the lessee could not elect to take grounds different from those named in the writings, and at the end of the five years, by holding over several years, became a tenant from year to year.

3. ESTOPPEL—*when available in equity, only.* Estoppels *in pais,* affecting permanent interests in land, can only be made available in

courts of chancery, and can not be rendered efficacious as a means of defense in an action of ejectment, or forcible entry and detainer, or forcible detainer.

4. Where a lessee of premises has a right, before the termination of his lease, to elect to take certain ground, upon which election his right to a renewal of his lease depends, the acquiescence of the agent of the lessor in the service of a notice of election by the lessee, by making no objection, or saying it was all right, will not estop the lessor from afterward insisting on the fact that the premises referred to in the notice are not the premises the lessee had the right to lease.

APPEAL from the Appellate Court for the First District;— heard in that court on appeal from the Superior Court of Cook county; the Hon. JOHN P. ALTGELD, Judge, presiding.

On January 6, 1885, the Illinois Central Railroad Company commenced, in the Superior Court of Cook county, this action of forcible entry and detainer against the Baltimore and Ohio and Chicago Railroad Company, to recover possession of certain freight station grounds described in the complaint then filed. Such proceedings were had in the suit as that, upon a trial, judgment was rendered therein for the defendant, and that judgment was afterwards reversed (*Illinois Central Railroad Co.* v. *Baltimore and Ohio and Chicago Railroad Co.* 23 Ill. App. 531,) and the cause remanded. Upon a second trial the result was otherwise, the court finding the issues for the plaintiff, and that the plaintiff was entitled to the possession of the premises in controversy, and rendering a judgment in favor of plaintiff for possession, and for costs. This was followed by a judgment of affirmance in the Appellate Court, and a further appeal brought the record here.

On July 27, 1874, the appellee corporation, as lessor, and the appellant corporation, (by its then corporate name of "The Baltimore, Pittsburg and Chicago Railway Company, Illinois Division,") as lessee, joined in the execution of a lease of the premises in question, which are situated in the city of Chicago, north of Randolph street produced, and a short distance east of the Illinois Central passenger station, at the foot·

of Lake street, with a strip of ground 12 feet in width, extending 600 feet southerly, as an outlet. The lease was signed by the respective presidents of said corporations, and attested by their secretaries, the corporate seals of the respective corporations being thereto affixed. Said lease was in substance as follows:

"Lease made this 27th day of July, 1874, between the Illinois Central Railroad Company, of the one part, and the Baltimore, Pittsburg and Chicago Railway Company, (Illinois Division,) of the second part.

"The party of the first part lease to the second party, from this date to the first day of November, 1879, the following ground in the city of Chicago, Illinois, viz.:" [Here follows a particular description of the lands in controversy.] "In consideration of said leased ground, the second party is to pay the first party, within fifteen days from the expiration of each month during this lease, and any extension thereof, the sum of $1820, possession of said ground to be delivered to the party of the second part about the first of September next. Upon such possession being given, rent is to commence. It is agreed that at the expiration of this lease the first party will take the said freight house then upon said ground, at its then value, to be ascertained by appraisal. And the first party may, at its option, have the tracks and other improvements upon the grounds at the expiration of said lease, at an appraisal of their then value, said appraisal to be made by arbitrators, each party selecting one, and if they disagree they are to select an umpire. If the first party does not elect to take said improvements other than the freight house, the second party may remove the same before the expiration of this lease. It is further expressly agreed between the parties hereto, that if the second party elects to lease freight station grounds in perpetuity of the first party, as specified in certain articles of agreement between said parties, bearing date the 27th day of July, 1874, and shall give notice to the first party as therein

provided, then the first party agrees to extend this lease for a further term, on the same conditions, or furnish the second party a lease of other as suitable ground for its freight business, upon terms to be agreed upon, until the first party delivers to the second party the possession of the ground so leased in perpetuity, or is prevented from so doing as specified in said articles of agreement. The second party is to pay all taxes legally assessed on the property hereby leased, and is to use the property in conformity with the ordinances of the city of Chicago."

The parties, on the same 27th day of July, 1874, also entered into a certain other contract, which was duly executed by them, and attested by their respective corporate seals, and wherein appellee was named as party of the first part and appellant as party of the second part. Portions of said contract material in this controversy were as follows:

"*Witnesseth*, That said party of the first part, for and in consideration of the covenants and agreements hereinafter expressed, has let and leased, and does hereby let and lease, unto the said party of the second part, the right to run its cars, engines and trains, for the transaction of the business of the said party of the second part, over that portion of the Illinois Central railroad extending from the junction of the two roads at or near Hyde Park to the north line of Randolph street extended, in Chicago, for the passenger trains, and for freight trains, from said junction to the south line of the freight depot grounds this day leased by the said party of the first part to the said party of the second part. And the said party of the second part is to have the use of such tracks upon that part of the railroad of said party of the first part as may be agreed upon, for running over its road the trains, cars and engines of said party of the second part, under the rules and regulations of said party of the first part, for and during the term of five years, from the first day of November, 1874. And the said party of the second part shall have the above mentioned

right to run its cars, engines and trains, under the obligations herein expressed, in perpetuity, if within said term of five years it shall so elect, and shall also elect to lease the freight station grounds hereinafter named of the first party, in perpetuity, and shall notify said party of the first part of such election in writing,—it being understood by the parties hereto that said freight cars shall be run, after the expiration of said term of five years, over the track of the Illinois Central railroad, only as far north as the south line of the ground hereinafter to be leased to said party of the second part. And the said party of the second part hereby covenants to and with the said party of the first part, to pay monthly, for and during the term of five years above mentioned, and for and during the extended term, (if such election shall be made as above provided,) for the right and use above mentioned, upon all its traffic to and from Chicago, as follows, to-wit:"

Here followed a scale of charges to be paid by the second party to the first party upon passengers, freight, etc., and various other clauses which are here immaterial. The concluding agreements of the contract read thus:

"Should the second party elect to lease permanent freight grounds upon the Lake Front, the first party agrees to enclose and fill the same ready for occupancy to an extent and in a manner to be agreed upon between the parties. If the first party shall be prevented by legal proceedings from enclosing and filling said grounds before November 1, 1879, then the arrangement herein between the parties hereto shall be continued for another term of five years, or for such portion thereof as may be necessary to enable the party of the first part to obtain legal title to and to enclose and fill the ground aforesaid. Should the party of the first part be unable to secure legal title before the expiration of three years from November 1, 1879, or should the second party be unable to obtain convenient and proper access to said permanent freight grounds, then, in either case, the party of the second part shall

have the right to select other freight grounds not owned or claimed by the Illinois Central Railroad Company. The second party agrees not to attempt to acquire from any other source than by contract with the Illinois Central Railroad Company any title or right of possession in the submerged or other lands that may be claimed by the first party, between Hyde Park Junction and Randolph street extended, and any such attempt shall work a forfeiture of all rights under this contract.

"This agreement shall estop the second party from acquiring or setting up any claim to said lands adverse to the claim or title of the first party, and from acquiring any claim, title or possession in said lands under the law, by condemnation or otherwise, except by, through and with the consent of the first party. And the said party of the second part agrees to pay therefor seven per cent interest upon $1.50 per superficial foot for lease in perpetuity, with the right to pay the gross sum in full, at the option of said party of the second part.

"The said party of the first part agrees to give to the said party of the second part a site for an engine-house of ten stalls, at a fair ground rent, for a term of five years. The said party of the first part agrees to take the engine-house at the end of the term, at a valuation that may be agreed upon. If the second party elects to lease the above named freight grounds on the Lake Front in perpetuity, then the first party will furnish it a site for an engine-house of ten stalls for the same time, upon equitable terms.

"The said party of the first part hereby gives its consent that said party of the second part shall be allowed an interest in the proposed new passenger station, if said party of the second part so desires, either as joint owner or upon a fair rental, as may be agreed upon between the parties in interest. And the said party of the first part hereby agrees to give said party of the second part the right to use its undivided interest in the Chicago passenger station, and the stations between Chicago and the junction at Hyde Park, for a reasonable com-

pensation.  And the said party of the second part shall have its business transacted over the St. Charles Air Line railroad, at the minimum rental charged any party not an owner.

"In case of any disagreement as to the valuation, rentals, ground rents, extensions of shore line, or filling in, or other things that are to be agreed upon by the parties, or in case of any disagreement as to the terms of the contract or the several things that are to be done by the parties hereto, the matters in difference are to be referred to arbitrators, one to be chosen by each company, and upon their failing to agree, they to appoint an umpire."

The appellant took possession of the premises under the lease and contract, constructed a freight house thereon, and operated its freight and passenger business, paying to appellee rent in accordance with the terms of the lease, for the freight station grounds, and in accordance with the contract for the right to run its cars, etc., and continued so to pay until November 1, 1884.

At the time the lease and contract were made, in 1874, the right of way and track system of the Illinois Central Railroad Company extended north from south of Twelfth street to the north line of Randolph street, a width of 200 feet, the west line of such right of way being 400 feet east of the west line of Michigan avenue, and protected on the east from Lake Michigan by a breakwater.  The railroad company claimed the right to fill out into the lake an additional strip 100 feet in width, by virtue of an ordinance of the city passed June 14, 1852, purporting to give it a right of way 300 feet wide, of which but 200 feet had theretofore been appropriated; and also claimed, by virtue of the so-called "Lake Front bill," passed by the legislature on April 16, 1869, the fee to the submerged lands of the lake for the distance of one mile east of its tracks and breakwater, and the right to fill up the lake bed to that distance.  North of Randolph street and to the mouth of the Chicago river the company claimed as riparian

owner, and it had filled a large area of territory east of its main tracks, and depots, elevators and yard tracks were placed thereon.

In 1871 an information had been filed in the Circuit Court of the United States for the Northern District of Illinois, on behalf of the United States, and against the railroad company, and the latter restrained from continuing its works in the waters of the lake or in any way encroaching upon the outer harbor of Chicago. In 1872 a stipulation had been made in the case, by which the company was permitted to proceed with the construction of wharves and docks within that portion of the outer harbor lying between the south pier, at the mouth of the Chicago river, and the north line of Randolph street extended eastwardly, the company agreeing to conform to the harbor lines which had been established by the United States engineer officers in charge of the harbor, and with the directions they might give in reference to the prosecution of the work. By orders of the War Department, made in 1871 and reiterated in 1882, the filling up of any part of the basin or harbor south of the prolongation of the north line of Randolph street and outside of the present line of piling made to protect the track of the Illinois Central Railroad Company, was prohibited until the title to such submerged lands should be judicially settled, and the plans for wharves and docks thereon approved by the Secretary of War.

Early in the fall of 1879, before the expiration of the first term of five years provided in the lease, Keyser, general manager of appellant, went to Chicago for the purpose of looking into the subject of permanent freight depot grounds, and after examining the situation from maps, and familiarizing himself with the location, went, in company with the president and general superintendent of the Illinois Central company, upon certain grounds situate north of Randolph street extended, and east of the freight station then occupied by appellant under the lease, which grounds the appellee corporation offered to

appellant for a permanent freight station. In the negotiations between the representatives of the two companies as to permanent freight grounds, it was stated that appellee could not furnish ground south of Randolph street, owing to legal difficulties and complications. About two-thirds of the whole area of the proffered freight station grounds lie north of the north line of Randolph street, and about one-third south of that line. The length, from north to south, of the portion north of the line is about 720 feet, and its width at the north end is $187\frac{1}{2}$ feet, and at the south end 165 feet. The portion south of the line extends in a southerly direction a distance of 1440 feet, and its width at said north line of Randolph street is about 165 feet, and it diminishes in width as it extends south, and at its lower extremity it is $12\frac{1}{2}$ feet wide. These proposed new freight grounds were measured, a tracing or outline furnished to Keyser, the shape of the grounds discussed, and a rental of $24,000 a year agreed upon, the basis of such rental being seven per cent interest on a valuation of two dollars per foot. Afterwards, Keyser, general manager of the appellant company, addressed the following letter to the president of the appellee company:

"WHEELING, W. VA., *Oct. 23, 1879.*

"*W. K. Ackerman, Pres. Illinois Central R. R. Co., Chicago, Ill.*

"DEAR SIR—Under the contract dated July 27, 1874, between the Baltimore, Pittsburg and Chicago Railway Company, Illinois Division, (whose corporate name now is the Baltimore and Ohio and Chicago Railroad Company,) and the Illinois Central Railroad Company, the former company has elected to run its cars, engines and trains in perpetuity, under the obligations expressed in said contract. It has also elected to lease the freight station grounds in perpetuity, and gives this notice accordingly. I have had our counsel draft the form of lease or contract between the two companies, in which the description of the freight grounds is left blank, awaiting the report of your engineer. I enclose this form for your exam-.

2—137 ILL.

ination.  Please let me know whether any amendments or modifications are needed in it.  I believe it embodies the suggestions made by both of us when I last saw you in Chicago.

"Yours, respectfully,

WILLIAM KEYSER,

*Gen. Manager Baltimore and Ohio and Chicago R. R. Co."*

"P. S.  Since writing this I have been advised that the description is ready, and I have therefore requested our counsel to embody it in the lease before presenting same to you."

The above letter was accompanied by a draft of a lease, which contained a description of the land shown by the officers of the Illinois Central Railroad Company to Keyser.  The letter, together with the draft, was delivered on October 29, 1879, to the solicitor and to the general superintendent of the Illinois Central Railroad Company, the president, Ackerman, being away.  On October 31, 1879, the superintendent of the appellant company called upon Ackerman, and asked him if he had received the letter of Keyser, and he said he had—that it was a notice of the election of the Baltimore and Ohio and Chicago Railroad Company to run its trains and occupy the freight grounds in perpetuity, and that it was all right.

The draft of lease submitted by the Baltimore company was not satisfactory to the Illinois Central company, and a counter-draft was prepared by the solicitor of the last named company, which was submitted to appellant.  The terms and provisions of the draft and counter-draft were essentially different, and there was no agreement reached between the companies on the points of difference.  Several letters, having reference to the completion of the contract or lease for the proposed freight station grounds, passed between the officers of the respective companies at intervals, from the fall of 1879 until some time in the spring of 1883, and several interviews were had during said period between representatives of the companies, in which the subject of the pending lease or contract, and the obstacles in the way of closing it up, were to

some extent discussed, but no definite understanding was ever reached. On March 12, 1883, the president of the Illinois Central Railroad Company addressed the following letter to John W. Garrett, president of the Baltimore and Ohio Railroad Company:

"My Dear Sir—When last I had the pleasure of meeting you in Baltimore I called your attention to the desirability of securing for your Co. a piece of land in the city of Chicago, for freight purposes, lying east of your present freight house, the understanding being that we were to purchase your present building at an appraised valuation. The Michigan Central R. R. Co. are very anxious to secure additional facilities here, and would, I think, be glad to take the piece of ground which we had rather reserved for your Co. If you do not desire to lease it, however, will you please advise me definitely, so that I can treat with the other Co. If I do not hear from you by the first of April, I will assume that you do not care to take the grounds offered.

"Yours, very truly,      W. K. Ackerman, *Pres't*."

And on March 26, 1883, said president of the Central company addressed the following letter to the president of the appellant company:

"Chicago, *26 March, 1883.*
"*B. Dunham, Pres't B. & O., Chicago R. R. Co., Newark, O.*

"Dear Sir—As the contract under which the Baltimore & Ohio R. R. Co. uses our tracks for an entrance into Chicago was formally made with the B. & O. and Chicago R. R. Co., of which you are president, I think it well to send you enclosed a copy of a letter I have addressed to Mr. J. W. Garrett, Pres't of the former Co., and to which I beg to request your earnest attention.

"Yours, very truly,      W. K. Ackerman, *Pres't*."

The reply to these letters, dated March 29, 1883, and addressed to Ackerman, was as follows:

"Dear Sir—I have received from President Garrett, of the B. & O. R. R. Co., your letter of the 12th inst., addressed to him, concerning the permanent freight grounds for the B. & O. & C. R. R. Co., at the city of Chicago. This company will accept as permanent freight grounds those referred to in that letter upon the terms of the contract of July 27, 1874.

"Yours, very respectfully,

B. Dunham,

*President B. & O. & C. R. R. Co.*"

The answer, under date of April 2, 1883, to the last mentioned letter, was as follows:

"Dear Sir—Your favor of the 29th inst. was duly received. I supposed it was well understood that if your company desires to lease the ground referred to in my letter to Mr. Garrett of the 12th of March last, it must be made the subject of an independent agreement. Terms were nearly concluded with Mr. Keyser three or four years ago, and, if agreeable to your company, we should be willing to resume the negotiations where he left them, but, for the reason stated in my letter to Mr. Garrett, immediate action is desirable.

"Yours, truly,          W. K. Ackerman, *Pres't.*"

There was no reply to the above letter from Ackerman, and no further negotiations between the parties on the subject.

Notice to quit was, on May 16, 1884, served on the secretary, and on May 17, 1884, served on the president of the appellant corporation. Said notice to quit was as follows:

"*To the Baltimore and Ohio and Chicago Railroad Company:*

"Please take notice that you are hereby required to quit and deliver up possession of the premises which you now hold of the Illinois Central Railroad Company, situate in the city of Chicago, on the first day of November next, unless the current year of your tenancy shall expire before that day, in which case you are hereby required to quit and deliver up possession of the said premises at the end of the current year's tenancy,

the Illinois Central Railroad Company having elected to terminate your tenancy at that time. The premises above referred to are the same which were leased to the Baltimore, Pittsburg and Chicago Railway Company, (Illinois Division,) by the Illinois Central Railroad Company, by lease dated 27th of July, A. D. 1874, and are described as follows:" [Here follows the description.]

"You are further notified that the Illinois Central Railroad Company will take the freight house upon said ground at the expiration of said tenancy, at its value, to be ascertained by appraisal, as provided in the lease hereinbefore referred to, and that said Illinois Central Railroad Company has selected Leverett H. Clarke, chief engineer of the Lake Shore and Michigan Southern railroad, as one of the arbitrators to make such appraisal. By the terms of said lease, another arbitrator is to be selected by you, and you are requested to make such selection, and notify the Illinois Central Railroad Company thereof, as soon as conveniently may be. The tracks and other improvements upon the said premises, which the Illinois Central Railroad Company has, by the terms of the aforesaid lease, the option to take or not, at an appraisal of their value, will not be required by said company, and may therefore be removed by you, as provided in said lease.

THE ILLINOIS CENTRAL RAILROAD COMPANY,
By JAMES C. CLARK, *Pres't.*

"*Dated May 14, A. D. 1884.*"

Upon the second trial of this cause in the Superior Court, which was before the court without a jury, twelve written propositions of law were submitted to the court by the plaintiff, appellee here, and the court held each and all of said propositions to be law applicable in the decision of the case, and to the rulings of the court in so holding the defendant below duly excepted. Said twelve propositions of law were as follows:

"1. It being conceded that the defendant entered into possession of the premises described in the complaint as the tenant of the plaintiff under the lease of July 27, 1874, and that the term of years limited by the lease expired on the first day of November, 1879, and that the defendant continued to occupy the premises since the expiration of that term, with the consent of the plaintiff, until the 17th day of May, 1884, when a notice in writing was given by the plaintiff to the defendant to terminate the tenancy on or by the first day of November, 1884, and that the defendant continued in the occupation of the premises, without the consent of the plaintiff, until the commencement of this suit, the plaintiff is entitled to the possession of the premises and to recover in this suit, unless the defendant elected to lease freight station grounds, in perpetuity of the plaintiff, as specified in the agreement of July 27, 1874, and gave notice to the plaintiff as therein provided.

"2. The lease and agreement of July 27, 1874, did not give the right to the defendant to elect to lease any land of the plaintiff, wherever situated, for freight station grounds, in perpetuity, but the election was confined to the land specified in the articles of agreement.

"3. If it appears, from the evidence in this case, that the term 'Lake Front,' used in the articles of agreement of July 27, 1874, had acquired at that time in Chicago, by popular usage, a known local meaning, signifying that portion of the lake shore extending from Randolph street to Park Row, and the submerged lands immediately adjacent to that part of the lake shore; and if it further appears, from the evidence, that the parties to the said articles of agreement were aware of that local meaning, and understood the term 'Lake Front,' as used in said articles of agreement, in that sense, then the meaning to be put upon the contract is that which is the plain, clear and obvious meaning of the words used, giving to the term 'Lake Front' the particular local sense so acquired.

"4. The land specified in the articles of agreement for permanent freight grounds was situated upon the 'Lake Front,' by which phrase must be understood, in the light of the evidence, that portion of the shore of the lake, or the submerged land in front of it, lying south of Randolph street and between it and Park Row. It was also land which required to be enclosed and filled to make it ready for occupancy, and it appears from the agreement that doubts existed whether the plaintiff might not be prevented, by legal proceedings, from enclosing and filling the same before November 1, 1879. It further appears from the agreement that the plaintiff's title to this land was not considered secure, and that the plaintiff might not be able to secure the legal title and to enclose and fill the ground before the first of November, 1879.

"5. The freight station grounds which the defendant elected to lease in perpetuity are described in the draft lease accompanying the notice given by Keyser, the general manager of the Baltimore and Ohio and Chicago Railroad Company, dated the 23d of October, 1879. The land described in that lease was not a part of the ground specified in the articles of agreement, and was therefore not ground which the defendant could elect to take by virtue of the original contract.

"6. The evidence does not show that any valid completed agreement was made between the parties to make and accept a lease of the grounds specified in Keyser's notice, and even if such agreement had been in fact made, that would not, of itself, entitle the defendant to an extension of the original lease. The obligation of the plaintiff to extend the term of the original lease was dependent on the performance by the lessee of a condition precedent, viz., that before the term expired it should elect to lease freight station grounds in perpetuity of the plaintiff, as specified in the articles of agreement, and give notice to the plaintiff as therein provided. An agreement to lease grounds different from those thus specified would not be a performance of that condition, and therefore such an

agreement would not carry with it to the lessee the legal right to demand an extension of the original term, unless it was accompanied by a further agreement to that effect, or by a stipulation modifying the condition of the original lease.

"7. The lease and articles of agreement of July 27, 1874, were sealed instruments, and, under the common law rule established in this State, the terms of a sealed instrument can not be enlarged or varied by a subsequent parol agreement.

"8. In this case there is no evidence of any collateral agreement under seal to modify the terms of the original lease, nor is there any proof of a new agreement to extend the term of the original lease sufficient to answer the requirements of the Statute of Frauds. To be effective, a contract to extend the term of a lease for a longer period than one year must be in writing.

"9. Evidence has been introduced by the defendant for the purpose of showing that an agreement was made between the plaintiff and the defendant for a lease of the ground referred to in Keyser's notice of the 23d of October, 1879, but it does not appear that any contract was ever actually concluded. One indispensable requisite to a valid contract was wanting,— the reciprocal and definite assent of both parties to the same set of terms. It would, moreover, be necessary to the validity of such an agreement, that the 'contract, or some memorandum or note thereof, should be in writing, and signed by the party to be charged therewith, or some other person thereunto by him lawfully authorized in writing by such party.' There is no evidence in this case tending to show that any such contract or memorandum or note in writing was ever signed by either party, or by any person thereunto authorized by either party.

"10. The plaintiff is not estopped on equitable grounds, or by matter *in pais*, from insisting upon the fact that the premises referred to in Keyser's notice of the 23d of October, 1879, were not the premises which the defendant had the right to

elect to lease in perpetuity under the provisions of the lease and articles of agreement of July 27, 1874. It is the rule of law established in this State that estoppels *in pais* affecting permanent interests in land can be enforced only in a court of equity.

"11. If the parties attempted to select other ground than that contemplated by the agreement of July 27, 1874, for permanent freight station grounds, and the defendant gave notice of its election to take such new ground in perpetuity, and the parties failed to complete the lease and agreement, this fact can in no way affect the right of the plaintiff to recover in this action.

"12. The only freight grounds which the defendant could legally elect to take under the terms of the lease of 1874 were grounds upon the Lake Front, then submerged with water, and to be in the future by the plaintiff enclosed and filled and made ready for occupancy, and no substitution or attempted substitution of other land than as above described is legally valid unless such substitution is in writing, signed by the parties, or is actually executed by the execution, delivery and acceptance of a lease between the parties, embracing the description of such substituted lands."

The defendant below (appellant here) submitted to the court thirty written propositions to be held as law in the decision of the case. Of these, the court held eight to be the law, modified ten, and then held them, as so modified, to be law applicable to the case, and refused to hold twelve to be the law. To the decisions and action of the court in thus refusing and modifying the propositions offered by it, and holding the propositions as modified, appellant duly excepted.

Mr. JOHN N. JEWETT, and Messrs. SMITH & HARLAN, for the appellant.

Mr. W. C. GOUDY, and Mr. B. F. AYER, for the appellee.

Mr. Justice Baker delivered the opinion of the Court:

In the brief and argument of appellant it is said: "The substance of the controlling provisions of the lease and contract is, that the Illinois Central company agreed to furnish the Baltimore company with permanent freight station grounds and other terminal facilities, if, within the term of five years preceding November 1, 1879, the Baltimore company so elected, in connection with an election to continue permanently the use of the Illinois Central tracks and right of way from the junction to and into Chicago. The failure on the part of the Illinois Central company to furnish the permanent freight station grounds, by the very terms of the agreement, gave to the Baltimore company the right to continue in the use and possession of the freight station grounds described in the lease, and which are here in controversy, until the possession of other grounds should, at least, be tendered. This absolute right of the Baltimore company to permanent freight station grounds, either the ones described in the lease or new ones, was contingent only upon the election of the Baltimore company, and notice thereof in writing." The assumption that the contract and lease bound appellee absolutely to provide appellant with permanent freight station grounds, dependent only upon an election by the latter, and notice of such election, prior to November 1, 1879, to lease permanent freight station grounds, is not justified by the terms of those instruments. The grounds which, by the agreement, appellant might elect to take in perpetuity, were to be grounds upon the "Lake Front," and the right was dependent upon two conditions: First, the exercise of the right of election, and notice thereof, within the time limited; and second, the legal ability of appellee to enclose and fill and give possession of such grounds on the "Lake Front."

In this action under the Statute of Forcible Entry and Detainer, the judgment of the trial court and judgment of affirm-

ance in the Appellate Court have conclusively settled all questions of fact in favor of appellee.

The facts of the case, as found by the courts below, are clearly indicated, not only by the judgments which they rendered, but by the statements of fact contained in the written propositions which the trial court held to be applicable in the decision of the case. We must assume, then, the facts of the case to be, that the term "Lake Front," used in the articles of agreement of July 27, 1874, had acquired at that time in Chicago, by popular usage, a known local meaning, signifying that portion of the lake shore extending from Randolph street to Park Row, and the submerged lands immediately adjacent to the lake shore; that the parties to the said articles of agreement were aware of that local meaning, and understood the term "Lake Front," as used in said articles of agreement, in that sense; that the freight station grounds described in the draft lease which accompanied the notice of election, dated October 23, 1879, are not a part of the land or ground specified in the articles of agreement; that the parties attempted to select ground other than that contemplated by the agreement of July 27, 1874, for permanent freight station grounds, and appellant gave notice of its election to take such new ground in perpetuity; that no completed agreement was made between the parties to make and accept a lease of the grounds specified in such notice, that no contract therefor was ever actually concluded, and that there was never any reciprocal and definitive assent of both parties to the same set of terms.

At the time the contract and lease were made, in 1874, the Illinois Central Railroad Company was claiming the ownership of the submerged lands lying between Randolph street and Park Row, and extending about a mile into the lake, and was expecting to enclose and fill up such lands ready for occupancy. It was, however, at that time restrained by an injunction of the United States Circuit Court and an order of the War Department from so doing. The lease demised to appellant for

freight station grounds the premises here in controversy, for a term to expire on March 1, 1879. The lease also provided, "that if the second party elects to lease freight station grounds in perpetuity of the first party, as specified in certain articles of agreement between said parties, bearing date the 27th day of July, 1874, and shall give notice to the first party as therein provided, then the first party agrees to extend this lease for a further term on the same conditions, or furnish the second party a lease of other as suitable grounds for its freight business, upon terms to be agreed upon, until the first party delivers to the second party the possession of the ground so leased in perpetuity, or is prevented from so doing, as specified in said articles of agreement." The contract of even date provided: "And the said party of the second part shall have the above mentioned right to run its cars, engines and trains, under the obligations herein expressed, in perpetuity, if within said term of five years it shall so elect, and shall also elect to lease the freight station grounds hereinafter named of the first party in perpetuity, and shall notify said party of the first part of such election in writing." And said contract also provided: "Should the second party elect to lease permanent freight station grounds upon the Lake Front, the first party agrees to enclose and fill the same ready for occupancy, to an extent and in a manner to be agreed upon between the parties. If the first party shall be prevented by legal proceedings from enclosing and filling the said grounds before November 1, 1879, then the arrangement herein between the parties hereto shall be continued for another term of five years, or for such portion thereof as may be necessary to enable the party of the first part to obtain legal title to and to enclose and fill the ground aforesaid. Should the party of the first part be unable to secure the legal title before the expiration of three years from November 1, 1879, or should the second party be unable to obtain convenient and proper access to said permanent freight grounds, then, in either case, the party of the second part shall have

the right to select other freight grounds not owned or claimed by the Illinois Central Railroad Company."

At the time of the negotiations between the parties in the fall of 1879, the status in respect to the submerged lands between Randolph street and Park Row was substantially the same that it had been in 1874. The Illinois Central company was still prohibited by the injunction and by the order of the Secretary of War from enclosing and filling said grounds. In that condition of affairs said company offered to appellant, for permanent freight station grounds, the lands lying east of the premises in controversy, and all of which were north of the south line of Randolph street produced, except a strip of unequal width, which was necessary for an approach connecting the freight station grounds on the north with the main railroad tracks on the south.

One of the contentions of appellant is, that the term "Lake Front" meant simply land on or in the neighborhood of the lake shore; that it had no technical, prescribed meaning designating a portion of land on the Lake Front included between certain northern and southern boundaries; that the contract did not necessarily and exclusively mean land under water; that whatever the meaning usage had given to the term "Lake Front," the acts of the parties themselves should be looked to in order to discover what was the meaning of the term "upon the Lake Front," and that when appellee offered and appellant agreed to accept the lands which were in the fall of 1879 designated for permanent freight station grounds, the parties construed for themselves the clause now in dispute. It is said, in argument: "The primary subject matter before the parties was the location of land under the old, not the new, contract." It would seem that this is a begging of the question at issue. At the time indicated certain specific grounds were agreed upon, but the designation of such grounds was not necessarily referable to an intended selection under the terms of the articles of agreement of 1874. The claim of ap-

pellee is, that in 1879 it was not in the power of the Illinois Central company to furnish the ground intended by the contract of 1874, and not in the power of the Baltimore company to occupy it, and that these facts were known to and recognized by the officers of both companies. In view of this claim, it is quite reasonable to suppose that the selection of specific grounds in 1879 was in furtherance of a mutual intention existing in the officers of both parties to abandon the grounds pointed out by the contract of 1874 for permanent freight station grounds, and enter into a new contract and lease for other and different freight station grounds. But a further discussion of this matter would be useless, for, as we have already seen, it has been conclusively determined by the judgments of the courts below that both parties to the articles of agreement of 1874 understood the expression "Lake Front," as used in their contract, in the sense of signifying and meaning "that portion of the lake shore extending from Randolph street to Park Row, and the submerged lands immediately adjacent to the lake shore."

The words and terms used in the contract of 1874 mean just what the parties mutually understood and intended them to mean when they executed such contract. This being so, and both lease and articles of agreement being instruments under seal, it is not competent, either at common law or under the law of this State, to modify or change them by proof of a subsequent parol understanding or agreement. (*Chapman* v. *McGrew*, 20 Ill. 101; *Hume Bros.* v. *Taylor & Moss*, 63 id. 43; *Wittmer* v. *Ellison*, 72 id. 301; *Barnett* v. *Barnes*, 73 id. 216; *Loach* v. *Farnum*, 90 id. 368.) This would exclude any theory that the parties, by their conduct in 1879, and thereafter, gave an authoritative interpretation to the clause now in dispute.

The first paragraph of the notice of October 23, 1879, if that had been all, would have been a sufficient and valid notice of election under the contract of 1874. The subsequent par-

agraphs and postscript and draft of lease referred to therein necessarily limit and qualify said first paragraph, and confine the election of appellant to the premises described in said draft of lease. It is claimed that construction should be given which would accord with the intent to perpetuate the contract, and that would uphold rather than destroy; that the subsequent paragraph of the notice and the draft of lease were but superfluous, and should be eliminated as surplusage. It is not perceived upon what principle, matter which is relevant and material can be rejected as mere surplusage. The relevancy and materiality of that which is sought to be left out of consideration is readily perceived when reference is had to the fact, that prior to the notice the parties had agreed upon permanent freight station grounds which were outside of the lands included in the articles of agreement of 1874. As is well suggested by counsel, the Baltimore company, after giving the notice, could not have been compelled to accept any grounds except those described in the draft of lease, and, as the obligation must be mutual, the Illinois Central company could not be compelled to furnish any grounds other than those described in the form of lease submitted.

It is suggested that this is to receive the attendant facts and circumstances, and proof of the proposed lease, for the purpose of invalidating the notice, and to exclude from consideration the fact that the notice was given and received as a notice under the contract, for the purpose of perpetuating it. The effect, upon that theory, would be to change by parol the terms of the contract under seal,—and this, as we have seen, can not, under the frequently declared law of this State, be done. It was no doubt intended by the notice to preserve the right of the Baltimore company to run its cars, engines and trains in perpetuity upon the tracks of the Illinois Central company. But this could not be done, under the contract of 1874, without at the same time electing to lease in perpetuity

the freight station grounds named in said contract; and it has been authoritatively decided by the courts below, that the notice of election was for lands which are not those named in said contract. It appears from the rulings of the trial court upon the written propositions submitted to it, that that court found the fact to be, that the parties agreed upon the selection of certain land for permanent freight grounds for appellant which were different from the grounds specified in the articles of agreement of 1874, but that the parties disagreed upon the terms of a lease therefor, and that no contract in respect to the same was ever actually concluded. Even if a lease of the newly selected freight grounds had been duly executed by the parties, such lease would not, without an agreement or stipulation to that effect, have extended the lease of 1874 for a further term, and until possession was delivered or tendered of the permanent freight station grounds so leased, nor have carried with it, under the circumstances stated, to the lessee, a legal right to demand an extension of the original term demised by the lease of 1874,—and this, because the obligation to extend the term of the original lease was dependent, as a condition precedent, upon the election by appellant to lease grounds specified in the articles of agreement for permanent freight grounds, and the giving of notice thereof is provided for in said articles.

It is claimed that the effect of the notice of election, without any new lease or contract, was to continue in force the existing covenants between the parties. The covenant in the lease of 1874, to extend that lease for a further term, or furnish appellant other as suitable grounds for its freight business until possession was delivered of freight grounds leased in perpetuity, is expressly made subject to the condition precedent that appellant first elects to lease freight station grounds in perpetuity, *as specified in the articles of agreement*, and gives notice thereof as provided therein. And the covenants for

extension in the articles of agreement are upon like condition that appellant "elects to lease permanent freight grounds *upon the Lake Front,*" and are for the express purpose of enabling appellee "to obtain a legal title to, and to enclose and fill, *the ground aforesaid.*" From the findings of fact as found in this record, it would seem that the contingencies in which the covenants for an extension of the old lease were to take effect have never arisen.

At the trial the court held, as a proposition of law applicable in the decision of the case, in substance, that appellee is not estopped on equitable grounds, or by matter *in pais,* from insisting upon the fact that the premises referred to in the notice of October 23, 1879, were not the premises which appellant had the right to elect to lease in perpetuity under the provisions of the lease and articles of agreement of July 27, 1874, and refused to hold a proposition to the effect that if said notice of election was served prior to November 1, 1879, and no objection thereto was made, but that the president of appellee stated to the superintendent of appellant, who had served the notice, after the receipt thereof, on October 31, 1879, that he had received the said notice, and that it was the notice of election of the Baltimore, Ohio and Chicago Railroad Company to run its trains and occupy the freight grounds in perpetuity, and that it was all right, then appellee is precluded from making any objections to said notice of election or the form thereof, on the ground that said notice referred to grounds which are situate in part north of Randolph street, or to grounds which are not upon the "Lake Front." It is plain that if, upon the theory of an equitable estoppel, appellee is precluded from claiming the notice in question was not such a notice of election as is required by the lease and contract of 1874, then such estoppel, if appellee persisted in its refusal to deliver possession of the new freight station grounds selected, would work the result that the lease of 1874 would

vest appellant with the right to hold perpetual possession of the premises thereby demised, and virtually convert said lease into a lease in perpetuity. It is the well settled law of this State that estoppels *in pais,* affecting permanent interests in land, can only be made available in courts of chancery, and can not be rendered efficacious as a means of defense in an action of ejectment, or forcible entry and detainer, or forcible detainer. *St. Louis Stock Yards* v. *Wiggins Ferry Co.* 102 Ill. 514; *Same* v. *Same,* 112 id. 384; *Winslow* v. *Cooper,* 104 id. 236; *Blake* v. *Fash,* 44 id. 302; *Mills* v. *Graves,* 38 id. 466; *Wales* v. *Bogue,* 31 id. 464.

Our conclusions, then, are, that the notice of October 23, 1879, was not a valid and sufficient exercise of the right of election given by the lease and contract of 1874; that from and after November 1, 1879, appellant became and was a tenant from year to year of the premises here in controversy; that by the notice of May 17, 1884, to quit and deliver up possession on or before November 1, 1884, the tenancy was terminated at the latter date, and that thereafter appellant had no legal right to the possession of said premises.

The twelve written propositions of law that were submitted by appellee to the trial court, and held by that court, were in conformity with the views of the law herein expressed, and we find no error therein. The trial court was, perhaps, not strictly accurate in all of its rulings upon the propositions offered by appellant, but we find no substantial error in such rulings that would or could change the result reached.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*